FARISH CARTER, APPELLANT, VS. ARCHIBALD T. BENNETT, ROBERT MAY, W. G. DAVIS AND OTHERS, APPELLEES.

1. Where all the equities of the bill are denied by the answer, it is not of course to dissolve the injunction. The granting and continuing of injunctions rest in the discretion of the Court, to be governed by the nature and circumstances of the case.

2. A judgement recovered in the State of Georgia, as to matters of evidence, is entitled to full faith and credit in this State, but the same faith and credit are not due to subsequent acts under it, such as issuing and returning of execution thereon, and until said judgement has been prosecuted in a Court of this State, judgement recovered and execution issued and pursued to every available extent, the plantiff is but a creditor at large.

3. The trusts intended by the Courts of Eqnity, not to be reached or affected

by the statute of limitations, are those technical and continuing trusts, which are not at all cognizable at *law*, but fall within the proper, peculiar and exclusive jurisdiction of the Court of Equity.

4. The answer of a defendant is only evidence as to facts, to which other testimony could be received, and it will not be admitted to show that the intent and meaning of the parties to a written agreement was contrary to what appears on the face of it.

5. Courts should equitably construe lawful stipulations.

6. A person purchasing mortgaged or encumbered slaves at a very reduced price " *subject to all the liabilities that are against them in the way of debt, either by note, judgement or mortgage, as the property of the mortgagor, the mortgagor only warranting the same as against himself and heirs,*" and the great reduction in the price being unexplained must be considered to have purchased only the equity of redemption therein. And as between the parties, Courts of Equity will consider the justice, equity and understanding of the purchase to be, that any encumbrance in the way of debt, *then* existing against said slaves, either by *note, judgement or mortgage,* as the property of the vendor, were to be met and paid by the purchaser, to any amount not exceeding the value of the slaves, at the time said liability shall be enforced ; and such a purchase constitutes a constructive trust in rem in favor of the owner of s id encumbrances or any of them, such as Courts of Chancery only will enforce.

7. There is nothing in the history of the litigation between the parties as presented in the record, that should estopp the complainant from insisting upon said trust.

8. In cases where it is doubtful whether Courts of law can give relief, Courts of Chancery will entertain jurisdiction.

9. Where promissory notes are offered in evidence and ruled out by the Court, and not offered again, and where the mortgage given to secure said notes is also offered in evidence, but in consequence of said notes not being in evidence, the said mortgage and assignment thereof, were not and could not have been *fully considered and determined* by the Jury, and there were

other issues before the Jury, a judgement rendered under such circumstances should not be considered as a final and conclusive adjudication in respect to said mortgage and the ownership of said mortgage.

10. A mortgage executed in Georgia on slaves and real estate then in Ga., and said slaves *subsequently* removed to Fla , and the equity of redemption therein sold at a reduced value, under an agreement that they are purchased " *subject to all the liabilities against them, in the way of debt either by note, judgement, or mortgage in the State of Georgia, as the property of the vendor or mortgagor, the vendor only warranting the same against himself and his heirs,*" and afterwards removed from the State, some by the party complainant, and some by the defendant, and there being equities tangible, such as the Court of Chancery may seize hold of *in rem* and *force* the return of said slaves within the jurisdiction of the Court, or decree a personal liability, may be foreclosed in a Court of Chancery having jurisdiction in this State, on the slaves, as if they were in Florida within the jurisdiction of the Court, without embracing the real estate or any other property in Georgia, included in said mortgage, and forming *no part* of said purchase ; but any transaction or acts of the mortgagee or holder of the mortgage, in Georgia, which in equity and good conscience, under all the circumstances of the case, should be a set-off, or reduction, or credit on the indebtedness of the mortgage, will enure to the purchaser of the equity of redemption

11. Bills for a new trial not countenanced, and never should be entertained except in a very clear case of fraud or injustice, or upon newly discovered evidence, which could not *possibly have been produced* at the first trial.

12. The statute regulating " commissions for collecting" between attorneys and clients, relates only to per centage for collecting. For *other* services a reasonable and adequate remuneration may be allowed, to be ascertained by proof and either and both of them, constitute in this State, what is known and spoken of in this country and in England as " Fees" and " costs," between attorney and client, and constitutes a *lien*, which should be enforced under the same rules of law as in England, where those fees and costs are taxable, so far as consistent with our practice.

13. The right of set-off prevails in general cases, so as to interfere with the solicitor's lien upon the debt recovered, but where *other claims* arising out of different transactions and which could not have been a legal or equitable set-off in that suit exist between the parties, the Court will not divest the lien of the attorney or solicitor, which has already attached on the amount recovered for the costs of that particular litigation.

Appeal from an interlocutory order of the Circuit Court for Leon County sitting in Chancery.

Farish Carter filed his bill in the Court below, alleging that on the 13th day of October, 1839, one Warren Jordan, of the State of Georgia, executed a deed of mortgage, covering certain lands in said State, and seventy-nine slaves, to the Georgia Railroad and Banking Company, to secure to said Company the payment of certain notes given by said Jordan. That on the 31st day of May, 1842, the said Georgia Railroad and Banking Company, for a valuable consideration, assigned the said mortgage and the notes for which it was a security, to him Farish Carter. That he, said Carter, had recovered two several judgemnts against said Warren Jordan, in Georgia, one for $5000, and the other for $847.66, that shortly after the maturity of the notes secured by said mortgage, the said Carter being about to enforce his execution issued on said judgments, against said Warren Jordan, he, said Jordan, determined to remove the slaves embraced in said mortgage to the State of Texas, for the purpose of avoiding the payment of his debts, &c., that for this purpose said Jordan employed one Jeptha Harris, to take charge of said slaves and remove them to Texas, and he Harris, did in the night time receive said slaves and proceeded with them to Apalachicola in Fla. That soon after the arrival of said Harris at Apalachicola with said slaves, and before they could be embarked for

28

Texas, one John Watson of Columbus, Georgia, perceiving suspicious circumstances, instituted proceedings at random, in favor of said Georgia Railroad and Banking Company, and procured an attachment under which one Nathan Baker, Deputy Marshal, seized the said slaves, (except one who had been given for the transportation of the rest to Apalachicola.)

That said Harris being a stranger in Apalachicola, and greatly embarrassed by the unexpected seizure of said slaves, did by the advice of defendant Bennett, take the advice of counsel. That said Bennett was present at all consultations between said Harris and his counsel, and obtained the confidence of said Harris and a knowledge of all the circumstances connected with the removal of said slaves, and the object and purpose of such removal, and that said Harris was advised that his letter of attorney from said Warren Jordan, was insufficient to enable him to replevy the slaves or successfully make defence against said false attachment, and was also further advised to return to Georgia and obtain more ample authority. That said Bennett returned with said Harris to the plantation of Warren Jordan, in Georgia, and there found said Jordan and one Reuben Thornton, his father-in-law, to whom said Harris and said Bennett detailed the facts in respect to the seizure of the slaves. That Bennett manifested great interest in the execution of Jordan's purpose, offering his aid in replevying the property, and that under his advice, said Jordan executed a bill of sale of the said slaves to said Reuben Thornton, in the presence of said Bennett and said Harris as subscribing witnesses; but without any consideration whatever; but with the sole intent well known to

said Bennett, that said Thornton with the aid of said Bennett, and his friends might replevy the slaves for the benefit of Jordan, &c. That therefore said Thornton together with said Bennett and said Harris, returned to Apalachicola; but that the said Bennett instead of rendering the promised aid, threw every obstacle in the way to prevent their success in releasing the slaves, and influenced the Deputy Marshal to exact excessive and unusual bonds, which he well knew said Thornton could not give, and that said Bennett, when said Thornton despaired of success in regaining possession of said slaves, instituted a negotiation for the purchase of the whole of said slaves in the custody of the Deputy Marshal. That said Thornton failing to succeed in his and said Jordan's plans, and fearing the creditors of Jordan would soon pursue the property, sold all the slaves in custody of the Deputy Marshal to said Bennett and Robert J. Floyd, whom Bennett had associated with him in the purchase, for the sum of about $14,000, which was not one half of the value of said slaves, of which amount not more than $6000.00 was paid at the time, and $2000.00 since. That immediately after the sale by Thornton, the said Bennett and Floyd, obtained without difficulty the possession of all said slaves, by giving bond signed by themselves, and one security of nominal responsibility, and that a large number of said slaves were immediately removed from Apaiachicola and sent out of Florida for the purpose of sale beyond the reach of the creditors of Jordan.

Carter further alleged in his bill that at the time of the execution of the bill of sale from Thornton to Bennett and Floyd, the latter delivered to Thornton an instrument un-

der their hands and seals, certifying that the said slaves were sold subject to all liabilities against them in the way of debt, either by note, judgment or mortgage, in the State of Georgia, either as the property of Warren Jordan or of Reuben Thornton, &c., and certifying also that if any of the property should be lost by suit in consequence of any claims as aforesaid, such loss should be no set-off or plea against the payment of a note given by Bennett and Floyd in part payment, &c.

The bill also alleged that shortly after the sale from Thornton to Bennett and Floyd, the Georgia Railroad and Banking Company, then holders of said mortgage and mortgage debt, instituted a proceeding in Franklin Superior Court for the foreclosure of said mortgage, making said Warren Jordan the only defendant, and sued out an attatchment against said mortgage slaves for $5000.00, which was not one third the amount due on said mortgage notes, and that under said writ a part of said slaves were found in the possession of defendant Bennett, and one James Farrier, and a levy thereon was endorsed on said attachment. That after the assignment of the mortgage and mortgage debt to complainant, and on the 10 December, 1842, being then in Apalachicola and discovering that the attachment aforesaid was limited to the sum of $5000.00, filed an amended petition in said proceedings, setting forth the assignment aforesaid, and that a much larger sum was due on the mortgage than the sum sworn to, &c., that a new attachment was issued and levied upon thirty of said slaves, in possession of said Bennett and two of which were in the possession of Roberts, Allen & Co. That in the Superior Court of Florida then in session, complain-

ant Carter, by the consent of Reuben Thornton, who held a letter of attorney from Warren Jordan, deemed sufficient for that purpose; obtained a judgement and decree of foreclosure for $16,783.00. That an execution on said judgment was immediately awarded and a levy was made on the slaves attached; that said slaves so levied on were sold on the 31 day of December, 1842, and on the 9 day of January, 1843, and were bid in by R. H. Long for the benefit of complainant.

The bill further alleged that previous to said sale, and on the 15 day of December, 1842, said Bennett instituted an action of Trover against complainant Carter, in Franklin Superior Court, for the recovery of said slaves, sold as aforesaid, and that Roberts, Allen & Company, instituted a like action for the recovery of the two slaves levied on while in their possession. That in December, 1848, the said action of Trover instituted by Bennett, came on for trial before the Circuit Court for Franklin County, and that at said trial said Bennett claimed title under his actual possession at the time of levy, and through the bill of sale from Thornton, and that complainant Carter defended under the judgment of foreclosure aforesaid and the sale thereunder, but to his surprise said judgment and sale did not avail him as a legal defence, by reason of the fact that Bennett and others in possession of said slaves, were not made parties defendants in said proceedings, and by reason of a want of sufficient notice to Jordan, and by reason of the want of sufficient authority in Reuben Thornton to give the various consents he attempted to give in behalf of Jordan. That notwithstanding sixteen of said slaves had been retaken by Bennett, as hereinafter stated,

a verdict was rendered in favor of Bennett, and judgement given thereon for $19,999.66.

That an application for a new trial was made on the ground among others, that the verdict and damages were against the evidence, but that said application was refused among other things, because the said Court deemed it had no authority in law to grant a new trial, on the ground that the verdict was against evidence, and that on appeal the Supreme Court decided it had no power to correct the errors of the Circuit Judge in refusing to grant a new trial. That in like manner and at the same term of the Court the said Roberts, Allen & Co., recovered a judgment in the action instituted by them for $1075.00. That since the rendition of this judgment, complainant has for the first time been informed, that the suit in favor of Roberts, Allen & Co., was prosecuted by Bennett for his own use, and that said recovery is in fact the recovery of Bennett for slaves, which he had long before the trial retaken by force and disposed of.

The bill further alleges, that pending the said suits at law, the slaves purchased by complainant, were removed to the plantation of R. H. Long, in Jackson County, Florida, to abide the result of said proceedings, and that on or about the 17th day of April, 1843, the said Bennett by force did enter upon the premises of said Long, and seized and carried away sixteen of said slaves, and also the slaves sued for in the action in favor of Roberts, Allen & Co., which slaves said Bennett disposed of for his own use. That subsequently complainant Carter instituted an action of Trover against said Bennett, for the conversion of said sixteen slaves in Georgia, where process was served on said Bennett, and in said suit he, complainant, recovered judg-

Carter *vs.* Bennett, *et al.*—Statement of Case.

ment for $3850.00, principal, and $1310.38–100 for damages and hires. That no part of said judgment being paid, complainant instituted an action on said judgment in the United States District Court for the Northern District of Florida, and that afterwards on the 17 day of February, 1852, complainant recovered judgment therein against said Bennett for $7261.59–100 and that execution hath been issued thereon, returned no property found.

The bill further alleges that by reason of the irregularities in the pleadings and proceedings in the suit for the foreclosure of the mortgage as aforesaid, which did not reach or effect the merits of said mortgage, or the mortgage debt, or the equities of complainant ; he could not defend himself in a Court of law by setting up his equities as assignee of the mortgage debt as his equities as judgment creditor of Warren Jordan, and that his said claims were not considereded or allowed in said proceedings at law.

The bill further alleges that both Reuben Thornton and Warren Jordan, died insolvent in the State of Tennessee, in the year 1843, and at the removal of said slaves from Georgia, neither of them had any means or property accessible to complainant, which could be applied in payment of said mortgage debt or of said judgment, except the property other than the slaves embraced in the mortgage and that all said property has been exhausted either by the application of the proceeds to the said deed of mortgage, or to older and superior liens, except about 920 acres of land in Georgia, which as yet remains unsold, and for which two dollars per acre cannot be had. And further, that he is unable to obtain satisfaction of his judgment aforesaid from said Bennett, that said Bennett

has for a long time been embarrassed, and that shortly after the recovery against him, he removed to the State of Louisiana. That the slaves aforesaid cannot be found, and that they have been removed and scattered beyond the reach of complainant's claims.

The bill further alleges that defendants Semmes, Baltzell and Davis, claim to be interested in said recoveries at law in favor of Bennett and of Roberts, Allen & Co., and that they severally have a lien as attorneys upon the proceeds of said judgmnts, paramount to all the equities of complainant, for compensation, and fees for alleged services rendered dy them as attorneys for the plantiff in said judgments, and have notified complainant of the sums claimed by them severally, which in the aggregate exceed the sum of ten thousand dollars, all which complainant charges to be against equity, &c.

The bill also alleges that the judgment in favor of Bennett, has been assigned by him to Robert May, but charges that such assignment is fictitious and colorable, and intended to defeat the equities of complainant, &c.

The prayer of the bill for injunction and relief is set out in the opening of the opinion of the Court.

Among the other exhibits filed with the said bill of complainant is the following, viz ;

TERRITORY OF FLORIDA,   }
    Franklin County.   }

Whereas, Reuben Thornton of the county of Hall, in the State of Georgia, has this day sold R. J. Floyd, and A. T. Bennett the following negroes which are now in the possession of the Marshal under an attachment sued out against one J. L. Hodges, to wit : (naming them—seventy-eight in

number,) which said negroes are sold by the said Thornton to us the said R. J. Floyd and A. T. Bennett, subject to all the liabilities that are against them in the way of debts, either by note, judgement or mortgage in the State of Georgia, either as the property of Warren Jordan or the said Reuben Thornton, the said Reuben Thornton only warranting the same against himself and his heirs.   This is therefore given by us to show that if any of said property should be lost by suit in consequence of any claims as aforesaid, that it is to be no off-set or plea against the payment of the notes of seven thousand dollars, bearing even date wiih these presents, given by said Bennett and Floyd in payment for said negroes, as witness our hands and seals this 16th March, 1842.

R. J. FLOYD, [seal.]

A. T. BENNETT, [seal.]

Signed, sealed and delivered in presence of

J. C. HARRIS,

J. M. TENGUE.

The complainant also annexed to his bill copy of a plea sworn to by A. T. Bennett, on the 24th July, 1844, in a certain case instituted by Charles T. Thornton, against him on the note for $7000.00, given by him and Floyd to Reuben Thornton, in which he alleged that the note aforesaid "was made and executed in consideration and payment of certain negroe slaves, sold to defendant on the 16th day of March, 1842, "that said slaves being the property of one Warren Jordan, in the State of Georgia, were fraudently, clandestinely, covinously, collusively, wickedly, illegally and improperly against the laws of said State, run off, removed and carried away from said State by said Jordan

and Reuben Thornton, said removal being made, executed, contrived and devised of fraud, covin, collusion and guile, to convey them from said State, out of and beyond the United States to Texas, to the end, purporse and intent to convert them to their own use and profit and to delay, hinder and defraud the Georgia Railroad and Banking Company and others to whom said slaves had been mortgaged and their creditors in said State of Georgia, contrary to the laws of said State ; that the sale to said defendant, (Bennett,) by the said Thornton and the giving and taking of said note of $7000.00, and its assignment to plantiff was in pursuance and consumation of the same wicked, fraudulent, corrupt, illegal, covinous and improper design contrivance and purpose," &c.

On motion in behalf of complainant Farish Carter, and after argument of the counsel for the parties, an injunction was awarded enjoining and restraining all proceedings upon the judgments and executions mentinned in the bill of complainant, in favor of A. T. Bennett and Roberts, Allen & Co.

The defendant, A. T. Bennett, alleges in his answer that the Court has no jurisdiction over so much of the matter of said bill as relates to the judgment asserted by complainant, to be held by him against Warren Jordan in the State of Georgia, because he says that said complainant has never obtained judgment in this State upon said judgment, and had execution issued thereon and a return of no property.

·  He further alleges 'that the facts in said complainant's bill, set forth as to the nature and character of said conveyance of said slaves by said Jordan to said Reuben Thornton, and

by said Thornton to this defendant, (Bennett,) were fully known to said complainant, (Carter,) in the year 1842, and more than five years before the bringing of this suit,— and that the rendition of said judgment, as is by said com· plainat asserted occured more than five years before the bringing of this suit, to wit : in the year 1842, and that the possession of said negro slaves by this defendant, (Bennett,) and his acts of ownership over the same, and said suit at law against said complainant for the seizure of said slaves, began more than five years before the bringing of this suit, to wit: in the year 1842, and have continued without any cessation or interrupition up to this time, and that therefore the right by said complainant in his said bill asserted as a judgment creditor of said Jordan, against defendant, (Bennett,) as the purchaser and owner of said negro slaves, or a judgment recovered for the conversion thereof, began and existed, if at all, more than five years before the bringing of this suit, and that the failure of the complainant to institute suit thereon has not arisen from any act of this defendant, nor been prevented by any legal disability of said complainant, but that such delay and lapse of time has arisen from the laches and fault of said complainant, all of which this defendant, (Bennett,) insists is a *bar* to the *discovery* and *relief* so prayed.

Defendant further in his answer *denies* he became liable as the trustee for said Carter as charged in said bill, and if such was the fact, because he says therein, that so far back as the year 1842, he asserted adverse title and possession to said negroes so purchased by him against the said complainant, of all which said complainant had notice at the time aforesaid, and has maintained the same up

to the present time, that *by reason of said fact* and said lapse of time, that said complainant is and should be barred from any and all relief sought for by said bill *by reason of said alleged trust.*

Bennett also in his answer says that to so much of said bill as seeks relief against the suits now pending in Franklin Circuit Court, in favor of this defendant against said complainant, said Court of Equity had no jurisdiction over said suits by reason of the fact, that if the matters alleged in said bill be true, it is competent for said complainant to plead to said suits a former recovery, and that said complainant has a *full and complete remedy at law* to said suits.

He also says that all and singular, the matters in relation to the claim by said Carter in his said bill set forth in respect to any mortgage of said slaves, sued for in said action of Trover, and as to the ownership by said Carter of the debt in said mortgage provided to be paid, *were* in said action of Trover *fully considered and determined,* and this defendant (Bennett) relies on the said judgment rendered in said action as a *conclusive* and *final* adjudication of said matters, and craves the benefit thereof as a *final settlement thereof,* and insists upon the same as a complete answer to so much of complainant's bill as seeks from said defendant any discovery in relation to said mortgage, or the *ownership of said mortgage* debt by said Carter, and in *bar* of the relief in respect to said asserted *mortgage* and *mortgage* debt, which said Carter asks in his said bill.

He also says that the said finding of said Jury, and said judgment of said Court in said action of Trover should be *deemed* and *held* to be *final* and *conclusive* upon said

questions, relating to any mortgage of said slaves, because such matter was a proper subject matter of defence, capable of being presented by said Carter on the trial of said action and capable of being considered by said Jury or Court in mitigation of damages, and that even if it was true that said matters were not presented to said Jury by said Carter, and by them were not considered, yet that such failure, if it had occured, was the fault of said Carter, and that it is contrary to Equity and grossly vexatious on the part of said Carter to seek to renew the litigation in respect to said alleged mortgage, by said Carter now again in his said bill set up, after the *same matters have been fully* heard, and after said Carter attempted to prove said matters on the trial of said action of Trover, and that it is contrary to Equity and the rules of Equity proceedings and beyond the power and jurisdiction of said Court of Equity to re-examine and decide in this proceeding the said matters so before fairly tried and decided in said suit at law, or in any wise to re-investigate the matters of fact which might and should have been litigated in said action at law.

He also says that if the allegations in said Carter's bill be true, that said facts as to said mortgage and the rights of said Carter in respect thereof, *were not fully tried and decided* in said action of Trover, yet, this defendant (Bennett) insists that the conduct of said Carter in keeping back his asserted equitable claim, and obstinately litigating with defendant in a Court of law, at a ruinous cost to defendant, whilst as said Carter now asserts, said Court had no jurisdiction to administer complete relief, *does not entitle* the said complainant to the aid of this Court; but on

the contrary imperiously requires, that by refusal to grant this relief asked, a just rebuke should be administered to conduct so litigious and oppressive in its character.

Bennett in his said answer also denies the statements in said bill, as to the ground of the refusal of the Judge who tried said suit in Trover between said Bennett and Carter, to grant a new trial therein.

He also denies the allegations as to the character of the verdict of said Jury, and all the charges of gross error in said verdict, and insists that the complainant is not entitled again to re-examine the same matters, but that such decision thereof *is conclusive upon said complainant.*

He also denies that said judgment in the foreclosure suit against Warren Jordan, failed said Carter as a defence, on the trial of said suit in Trover, between said Carter and Bennett, because of *mere accidental irregularittes or mistakes over which he, said Carter had no control, and as to which he could not judge.*

He also denies that the failure of said Carter to obtain the benefit of his said proceedings in said suit of foreclosure against Warren Jordan, and the causes of said failure were of a kind not to impair any claim which said Carter might have to the aid of a Court of Equity, as is sought to be shown by said Carter by the statement made in his said bill, on the contrary this defendant insists that the acts of said Carter in respect to the said proceedings in said foreclosure suit, *do* and should seriously impair any such claim, if any he has, and that said proceedings in said foreclosure suit in said Superior (now Circuit) Court of Franklin County, against said Warren Jordan, and the acts of said Carter in connection with the same *are a bar to the relief* asked by said Carter.

He also *denies* the allegations contained in said Bill of complaint charging him with fraudulent conduct in the purchase of said slaves and with the intent as alleged of defrauding the Georgia Rail Road Banking Company, and the creditors of Warren Jordan, and insists that the same were passed upon by the Jury in the Trover suit of Carter and Bennett, and that the judgment rendered in said cause is and should be *final* and *conclusive.*

He also denies, that said judgment of Roberts Allen, & Co. was obtained as alleged in said bill, upon " like evidence," and because said judgment *is a bar* to the relief prayed for by said complainant in reference to said judgment.

He also asserts, that the lien of said defendants Davis and Semmes, for fees, upon the recovery of said judgment in Bennet vs. Carter, in Trover are superior to any of the Equities set up in the bill of complaint.

He further states, that previous to said sale to this defendant and Floyd, the said Thornton informed this defendant, that a portion of the said slaves were under Mortgage in the State of Georgia to the Central Bank of that State, for something under Five Thousand Dollars. That there was no other *valid claim* against the slaves, and that there was sufficient property in the State of Georgia to pay off said incumbrance. Defendant was informed afterwards, but did not know at the sale, that said Thornton had informed said Floyd that the Mortgage debt was nine thousand dollars or thereabouts.

He further says that the *day after* the execution of said Bill of Sale and the delivery of said slaves, the instrument in writing referred to in said Bill as exhibit F. was presented to the defendant to sign. That said Floyd had previously

(the same day) signed it, and it was then and there represented to this defendant that the sole purpose and object of said instrument, was to prevent said Floyd and this defendant from pleading any recovery of said negroes by virtue of any *claims* from the State of Georgia as a set off to the said joint note of $7000. And it was with this purpose and none other that this defendant was induced to sign said instrument. This defendant then believing that there was no *valid claims* against said property, *other than that stated by said Thornton* and previously referred to. And he denies that the object of said instrument was as stated in said Bill, but on the contrary it formed no part or condition of said sale further than before stated: That though said instrument bears date on the day of said Bill of sale, yet in point of fact, it was drawn up and executed on the next day thereafter.

That said Bill of sale was a full and absolute conveyance without condition whereas said instrument was upon a seperate piece of paper, and designed as a private memorandum for the protection of said Thornton's interest.

The record in the Trover suit instituted by Bennett vs. Carter referred to in the bill and answer was considered and admitted as evidence in this case, which embraced the testimony given by R. J. Floyd in that case, who stated that "Thornton at the time of sale, told me there was a Mortgage upon certain land and a portion of the negroes for some nine thousand dollars. He gave me a list of the negroes that he said were not mortgaged. The most of these negroes I got by his advice. After the suit was com-

menced I found that many of the negroes were mortgaged that he gave me a list of those as not being mortgaged. We did remove the negroes immediately from the jail to the schooner and got a steamer to tow us in the bay—we put them on Schooner Magnet—divided them at sea. I sold mine, Farrier disposed of his, or has them now, and the Marshal sold Bennett's. We put them on the Schooner to send them where they might be divided without being molested by the Georgia debt of nine thousand dollars. I was with the negroes. Bennett and Farrier were both there? the officers of the Schooner and Steamer that towed the Schooner down, were there and possibly some passengers on the Steamer."

A. G. Semmes and W. G. M. Davis who were made defendants, severally answered that they were engaged as Attorneys in the prosecution of said Trover suit of Bennett against Carter and severally claim that they have a lien for their fees upon the judgment rendered therein, superior to the alleged Equities of complainant and should be allowed the same out of said recovery. A. G. Semmes, Esq. claims that for his services in said suit he is entitled to the sum of $5000.00 and W.G. M. Davis, Esq. states that by contract and agreement with Bennett, he was to receive $2,500.00, for his services in the Supreme and Circuit Courts of the State, and the further sum of $1,200.00, for his services in the Supreme Court of the U. S.

Robert May likewise answered, stating that he held an assignment of the judgment rendered in the Trover case, as collateral security.

On the coming in of the answer of Bennett the Court below on motion in his behalf dissolved the injunction which

had previously been awarded, and the complainant Carter prayed an appeal to the Supreme Court.

*James T. Archer* and *R. J. Moses* for appellant.

*W. G. M. Davis* and *A. G. Semmes*, for appellees.

HON. W. A. FORWARD, Judge of the Eastern Circuit, (who presided in the case in lieu of BALTZELL, C. J. disqualified) delivered the opinion of the Court.

The bill was filed to cancel a bill of sale from one Reuben Thornton to said Bennett and Floyd, and to require the defendants Bennett, Floyd and Roberts, Allen & Co., to release all right, title, interest or claim under said bill of sale, in and to said slaves therein mentioned, as against the said Farish Carter, also to set aside a judgment at law in an action of Trover in the Circuit Court of Franklin Co., in this State, wherein the said Bennett was plantiff and said Farish Carter was defendant, for the conversion of some of the negroes mentioned in said bill of sale. And also in another action therein, between Roberts, Allen & Co., plantiffs, and said Farish Carter, defendant, (and which is alleged to be the property of said Bennett,) for the conversion of other of said negroes which where of said Jordan and Thornton ; and that they be required to release, cancel or discharge the same, or that they be perpetually enjoined from the collection thereof, or if the said judgment be not decreed to be cancelled as against equity and good conscience, that the said judgments be allowed to be paid extinguished and set-off on a mortgage of one Warren Jordan, to the Georgia Railroad and Banking Company, assigned to the said Farish Carter, embracing the said slaves in said bill of sale of Thornton to Bennett, (as well as other property real and personal,) and on another claim which the said Carter has as judgment creditor of said Jordan.

And that said defendants be enjoined from further proceeding in the prosecution or institution of any suits at law against said Carter, until the final decree in this cause.

And that said defendants Bennett and Floyd be required to produce the slaves received of said Thornton, under and by virtue of said bill of sale, and which have not been sold under execution upon a judgment of foreclosure of said mortgage upon a petition filed on the common law side of the Superior Court of Franklin County, by the said Georgia Railroad and Banking Company,) for the use of said Carter against Warren Jordan.

And that as to said last mentioned negroes, the said mortgage be foreclosed, and that said Bennett and Floyd and all persons claiming under them, be barred of and from all equity of redemption therein under said deed of mortgage, held by said Carter as such assignee, and that said slaves when produced be sold to pay the balance due on said mortgage debt, that said Farish Carter be allowed to credit upon said mortgage, at a fair and just valuation, the slaves sold and retained by said Carter, on the said judgment of foreclosure in said Superior Court, and which were not recaptured by said Bennett; and also the balance due said Carter on his said judgment in Georgia against said Jordan, and that if such sales prove insufficient, that the balance be decreed to be paid by said defendants, Bennett and Floyd, or if the said slaves cannot or will not be delivered up to abide the decree of said Court of Equity, that said Bennett and Floyd be decreed to pay the whole amount due to said Carter on said deed of mortgage, and judgment against said Jordan in Georgia, (*as it is contended*

*in said bill they agreed to do by their agreement with said Reuben Thornton at the time of their purchase.*) And that the said pretended assignment of said judgment in Trover against said Carter, to said Robert May by said Bennett, be declared null and void as against said Carter; and that the said pretended liens on said judgment in Trover for fees set up by defendants, Semmes, Baltzell and Davis, attorneys for said Bennett, be decreed to be contrary to equity; and that they be disallowed, or if any part of their said demands be allowed, that an account be taken thereof and the same adjusted upon proof. And a general prayer for other and further relief.

An injunction, after argument, was granted in the Circuit Court, and upon the coming in of the answer of the defendant (Bennett,) said injunction on motion of Solicitor, and without further argument, was ordered to be dissolved.

From which order (as provided by act of 7th January, 1853,) an appeal has been taken to this Court.

The first question that presents itself is the practice of Courts of Equity in dissolving or retaining injunctions, upon the coming in of the answer of defendant.

We believe it to be the almost universal practice, that if the answer fully denies *all the circumstances* upon which the *equity is founded,* credit is given to the answer and the injunction dissolved. This practice, however, is not without exceptions. Chancellor Kent in Roberts vs. Anderson, 2 John, Ch. R., says : " that even where all the equity of the bill is denied by the answer, it is not of course to dissolve the injunction ; as the granting and continuing an injunction rests always in the sound discretion of the Court *to be governed by the nature of the case.*"

The complainant by his solicitor contends that the Chancellor erred in dissolving the injunction, because there is sufficient equity disclosed by the answer to have induced the Court to continue it until the hearing; and also because the equity of the bill upon which the injunction rests, is not denied by the defendant.

The defendant insists that the injunction should be dissolved, because the said Bennett in his answer says:

I. The Court of Equity of this State has no jurisdiction over *part* of the matters alleged in said bill, to wit: "So much thereof as relates to the judgment, asserted by complainant to be held by him against Warren Jordan in the State of Georgia, because he says that said complainant has never obtained judgment in this State upon said judgment, and had execution issued thereon, and a return of no property.

II. Because as to *other parts* thereof, the said Bennett in his answer states "that the facts in said complainant's bill, set forth as to the nature and character of said conveyance of said slaves by said Jordan to said Reuben Thornton, and by said Thornton to this defendant, (Bennett,) were fully known to said complainant, (Carter,) in the year 1842, and more than five years before the bringing of this suit. And that the rendition of said judgment, as is by said complainant asserted, occurred more than five years before the bringing of this suit, to wit: in the year 1842, and that the possession of said negro slaves by this defendant, (Bennett,) and his acts, and ownership over the same, and said suit at law against said complainant for the seizure of said slaves, began more than five years before the bringing of this suit, to wit: in the year 1842, and

have continued without any cessation or interruption up to this time, and that therefore the right of said complainant in his said bill asserted, as a judgment creditor of said Jordan, against this defendant (Bennett,) as the purchaser and owner of said negro slaves, or a judgment recovered for the conversion thereof, began and existed, if at all, more than five years before the bringing of this suit, and that the failure of the complainant to institute suit thereon, has not arisen from any act of this defendant, nor been prevented by any legal disability of said complainant, but that such delay and lapse of time has arisen from the laches and fault of said complainant, all of which this defendant (Bennett) insists is a bar to the discovery and relief so prayed."

III. Because the said Bennett in his answer denies that he became liable as the trustee of the said Carter, as charged in said bill, and if such was the · fact, because he says therein, that so far back as the year 1842, he asserted adverse title and possession to said negroes so purchased by him, against the said complainant, of all which the said complainant had notice at the time aforesaid, and has maintained the same up to the present time, *that by reason of said facts* and said lapse of time, that said complainant is and should be barred from any and all relief sought for by said bill by *reason of said alleged trust,*

VI. Because the said Bennett in his said answer says that to so much of said bill as seeks relief against the suits now pending in Franklin Circuit Court, in favor of this defendant against said complainant, said Court of Equity had no jurisdiction over said suits by reason of the fact, that if the matters alleged in said bill be true, it is

competent for said complainant to plead to said suits a former recovery, and that said complainant has a *full and complete remedy at law* to said suits.

V. Because the said Bennett in his answer says that all and singular the matters in relation to the claim by said Carter in his said bill, set forth in respect to any mortgage of said slaves, sued for in said action of Trover, and as to the ownership by said Carter of the debt in said mortgage provided to be paid, *were in* said action of Trover *fully considered and determined*, and this defendant (Bennett) relies on the said judgment rendered in said action, as a *conclusive* and *final* adjudication of said matters, and craves the benefit thereof as a *final settlement thereof*, and insists upon the same as a complete answer to so much of complainant's bill as seeks from said defendant any discovery in relation to said mortgage *or the ownership of said mortgage* debt by said Carter, and in *bar* of the relief in respect to said asserted *mortgage* and *mortgage* debt, which said Carter asks in his said bill.

VI. Because the said Bennett in his said answer says, that the said finding of said Jury, and said judgment of said Court in said action of Trover, should be *deemed* and *held* to be *final* and *conclusive* upon said questions relating to any mortgage of said slaves, because such matter was a proper subject matter of defence, capable of being presented by said Carter on the trial of said action, and capable of being considered by said Jury and Court in mitigation of damages and that even if it were true that said matters were not presented to said Jury by said Carter, and by them were not considered, yet that such failure, if it had occurred, was the fault of said Carter, and that it is contrary to

equity and grossly vexatious on the part of said Carter, to seek to renew the litigation in respect to said alleged mortgage by said Carter, now again in his said bill set up after the *same matters have been fully heard,* and after said Carter attempted to prove said matters on the trial of said action of Trover. And that it is contrary to equity and the rules of equity proceedings, and beyond the power and jurisdiction of said Court of Equity to re-examine and decide in this proceeding the said matters so before fairly tried and decided in said suit at law, or in any wise to re-investigate the matters of fact which might and should have *been* litigated in said action at law.

VII. Because he says Bennett in his answer says, that if the allegations in said Carter's bill be true, that said facts as to said mortgage and thè rights of said Carter in respect thereof, *were not fully tried and decided* in said action of Trover, yet this defendant (Bennett) insists that the conduct of said Carter in keeping back his asserted equitable claim, and obstinately letigating with defendant in a Court of law at a ruinous cost to defendant, whilst as said Carter now asserts, said Court had no jurisdiction to administer complete relief, does not entitle said complainant to the aid of this Court, but on the contrary imperiously requires that by refusal to grant this relief asked, a just rebuke should be administered to conduct so litigious and oppressive in its character.

VIII. Because said Bennett in his said answer, denies the statements in said bill as to the grounds of the refusal of the Judge who tried said suit in Trover, between said Bennett and Carter.

IX.. Because said Bennett in his said answer denies

the allegations as to the character of the verdict of said Jury and all the charges of gross error in said verdict, and insists that the complainant is not entitled again to re-examine the same matters, but that such decision thereof is *conclusive upon said complainant.*

X. Because said Bennett in his said answer denies that said judgment in the foreclosure suit against Warren Jordan, failed said Carter as a defence on the trial of said suit in Trover, between said Carter and Bennett, *because of mere accidental irregularties or mistakes over which he said Carter had no control, and as to which he could not judge.*

XI. Because said Bennett in his said answer denies that the failure of said Carter to obtain the benefit of his said proceedings in his said suit of foreclosure against Warren Jordan, and the causes of said failure were of a kind not to impair any claim which said Carter might have to the aid of a Court of Equity, as is sought to be shown by said Carter by the statements made in his said bill, on the contrary, this defendant insists that the acts of said Carter in respect to the said proceedings in said foreclosure suit, *do* and should seriously impair any such claim, if any he has, and that the said proceedings in said foreclosure suit in said Superior (now Circuit) Court of Franklin County, against said Warren Jordan, and *the acts* of said Carter in connection with the same, *are in bar to the relief* asked by said Carter.

XII. Because the said Bennett in his said answer *denies* the allegations contained in said bill of complaint, charging him with fraudulent conduct in the purchase of said slaves, and with the intent as alleged, of defrauding the Georgia Railroad and Banking Company, and the creditors of War-

ren Jordan, and insists that the same were passed upon by the Jury in the Trover suit of Carter and Bennett, and that the judgment rendered in said cause is and should be *final* and *conclusive.*

XIII. Because the said Bennett in his said answer, denies that said judgment of Roberts, Allen & Co., was obtained as alleged in said bill, upon "like evidence," and because said judgment is *a bar* to the relief prayed for by the complainant in reference to said judgment.

Lastly. That the lien of said defendants, Davis and Semmes, for fees upon the recovery of said judgment in Bennett vs. Carter, in Trover, are superior to any of the equities set up in bill of complaint.

In determing whether the injunction shall be continued, it is necessary to examine whether the prayer of the bill in any of its aspects may be granted at the final hearing, for this purpose we take up the reasons urged by said defendants in the order presented.

To the 1st. objection. We say did the bill contain nothing but the claim set up under this judgment in Georgia, and the Complainant thereby seeks to interfere with the frauds of the original debtor, (Jordan) then the position assumed in this respect would be fatal, for until judgment has been recovered thereon, and execution sued out, and pursued to every *available extent,* he is but a creditor at large.

It is true the constitution of the United States provides that as to *matters of evidence* it shall be entitled to full faith and credit (and that credit is considered due to judgments of Courts of sister States in Florida,) but we cannot hold that the like faith and credit, should be given, to sub-

sequent acts under said judgment, such as issuing and returning of execution thereon in another State.

There are however *other* matters set forth in said bill, which we think as hereinafter stated, gives the said Court of Chancery jurisdiction in this cause, and as this judgment forms a part of the transactions, and is the property of the complainant who has submitted himself to the jurisdiction of said Court, and seeks justice therein, it may therefore be properly acted upon, the court of chancery having jurisdiction for one purpose will retain the bill as to all other matters necessary, to the attainment of justice between the parties, and arising out of the subject matters.

Holding these views on this point, it is deemed unnecessary to determine the various questions of remedy for recovery of claims of an equitable nature, by one non resident against another, so abley presented by the solicitors on both sides.

*To the* 2*nd. objection.* We do not think it necessary to decide in this cause, whether judgments of Courts of another State should be considered as simple contract debts or not, and under the operation of the *lex fori* as to the statute of limitations because there are sufficient circumstances and facts alleged in said bill, which (if found true) will bring the case within the well known rules of equity, taking it out of the operation of the act. Besides (as will be hereinafter seen) we hold that said Mortgage assigned to said Farish Carter, can be foreclosed in said Court of Chancery, under the bill in this cause, and that in said "Exhibit F." declared to be the agreement of said Bennett and Floyd, with said Thornton, of the terms of purchase, a *trust* is created for the payment of said mortgage and debts.

In Kane vs. Bloodgood 7 John Ch. R. 111. Chancellor Kent lays down as law, "That the trusts intended by the Courts of Equity, not to be reached or affected by the statute of limitations, are those technical and continuing trusts which are not at all cognizable at *law* but fall within the proper, peculiar, and exclusive jurisdiction of this Court." See also Bond vs. Hopkins, 1 Schoales and Lefroy 428. And this ruling seems perfectly harmonious with the judgment in Beckford and others vs. Wade 17 vesy 97, cited by Mr. Davis, one of the Solicitors for Defendants.

It is contended by Judge Semmes of Counsel for defendants, that said Bennett has held possession of these slaves *adversely* to Carter since the date of his purchase in '42, and Carter's rights (if any) are barred by the statute of limitations. · We have already seen that if this agreement, setting forth the terms of purchase, between Bennett and Floyd and Thornton is established, and the claims of Carter not barred at the time of the execution, then, the Court of Chancery has *peculiar* and *exclusive* jurisdiction. If it were not so the bill, exhibits, and answer, present anything but possession *adversely* to Carter,—in other words, adverse possession, according to the legal requirements thereof.

To the 3rd. objection. The said Bennett denies that he became liable as the trustee for said Carter as charged in said bill. It is contended in said bill that Bennett and Floyd, thus became liable under an agreement setting forth the terms of the purchase, which said agreement is in the following words:

TERRITORY OF FLORIDA, ⎱
    Franklin County. ⎰

Whereas, Reuben Thornton of the county of Hall, in the State of Ga., has this day sold R. J. Floyd, and A. T. Bennett the following negroes which are now in the hands and posses sion of the Marshal under an attachment sued out against one J. L. Hodges, to wit: (naming negroes, seventy-eight in number,) which said negroes are sold by the said Thornton to us the said R. J. Floyd and A. T. Bennett, subject to all the liabilities that are against them in the way of debts, either by note, judgment or mortgage in the State of Georgia, either as the property of Warren Jordan or the said Reuben Thornton, the said Reuben Thornton only warranting the same against himself and his heirs. This is therefore given by us to show that if any of said proper- ty should be lost by suit in consequence of any claims as aforesaid, that it is to be no off-set or plea against the pay- ment of the note of seven thousand dollars, bearing even date with these presents, given by said Bennett and Floyd in payment for said negroes, as witness our hands and seals this 16th March, 1842.

R. J. FLOYD, [seal.]<br>A. T. BENNETT, [seal.]

Signed, sealed and delivered in presence of

J. C. Harris,

J. M. Tengue.

When we take into consideration the whole facts of this case as disclosed by the record in the Trover suit, there cannot be a doubt but that both Bennett and Floyd, at the time of the purchase were conversant of the fact, that there were liabilities beyond the mortgage, of said Jordan and Thornton in Georgia. At any rate they were sufficiently advised to put them on their guard. They certainly knew

that *five* days before their purchase, Warren Jordan sold these same negroes (with four others) making in all 79, to said Reuben Thornton, for $30,000 *cash down*—the bill of sale of which, was witnessed by the said Bennett in Georgia, where he had gone at the request of said Thornton on business connected with the same slaves.

Knowing this they purchased 65 of said negroes for $14,000—and partly on credit. Now why this *reduced price?* It is not explained by Mr. Bennett in his answer? Is it not the natural conclusion that the amount due on the mortgage on said slaves and Carter's Judgment in Georgia then recovered and a *lien* upon them form a part of the consideration they were to pay? What did they mean when they declared under their hand and seal, that they bought said negroes subject to all the liabilities that are against them in the way of debt, either by note, judgment or mortgage in the State of Georgia, either as the property of Warren Jordan or the said Reuben Thornton? Mr. Bennett in his answer to the bill of complaint, states: "That previous to said sale to this defendant and Floyd, the said Thornton informed this defendant, that a portion of said slaves were under mortgage in the State of Georgia, to the Central Bank of that State, for something under five thousand dollars, that there was no other VALID CLAIM against the slaves, and that there was sufficient property in the State of Georgia to pay off said incumberance. Defendant was informed afterwards, but did not know at the sale that said Thornton had informed said Floyd that the mortgage debt was nine thousand dollars or thereabouts."

"This defendant further says that the day after the execution of said Bill of Sale, and the delivery of said slaves

the instrument of writing referred to in said bill as exhibit "F." was presented to the defendant to sign, that said Floyd had previously (the same day) signed it, and it was then and there represented to this defendant that the sole object and purpose of said instrument, was to prevent said Floyd and this defendant from pleading any recovery of said negroes by virtue of any CLAIMS from the State of Georgia as a set-off to the said joint note of 7,000 dollars. And it was with this purpose and none other that this defendant was induced to sign said instrument. This defendant then believing that there was no *valid claims* against said property, other than that stated by said Thornton and previously refered to."

This defendant denies that the object of said instrument was as stated in said bill, but on the contrary it formed no part or condition of said sale further than before stated; that though said instrument bears date on the day of said bill of sale, yet in point of fact, it was drawn up and executed on the next day thereafter."

"That said Bill of Sale was a full and absolute conveyance without condition—whereas said instrument was on a seperate piece of paper and designed as a private memorandum for the protection of said Thornton's interests."

Mr. Floyd says—see his testimony in record of Bennett vs. Carter, Trover suit, p. 7. " *Thornton at the time of sale, told me there was a mortgage upon certain land, and a portion of the negroes for some nine thousand dollars.*" He gave me a list of negroes, that he said was not mortgaged. The most of these negroes I got by his advice. After suit was commenced, I found that many of the negroes were mortgaged, that he gave me a list of, as not being mort-

gaged." Again on p. 9 he says: we did remove the negroes immediately from the jail to the Schooner, and got a Steamer to tow us in the bay." "We put them on Schooner Magnet—divided them at sea,—I sold mine, Farrier disposed of his, or has them now, and the Marshal sold Bennett's. WE put them on the Schooner to send them where they might be divided without being molested by the Georgia debt of nine thousand dollars. I was with the negroes ; Bennett and Farrier were both there; the officer of the Schooner, and Steamer that towed the Schooner down were there, and possibly, some passengers on the Steamer."

In addition to which Mr. Bennett in an affidavit filed in a suit of Charles T. Thornton vs. Bennett and Floyd— which will be found on page 97 of said record, made an exhibit to the bill in this cause. "That the said slaves being the property of one Warren Jordan in the State of Georgia, were fraudulently, clandestinely, covinously, collusively, wickedly, illegally and improperly, against the laws of said State, run off, removed and carried away from said State, by said Jordan and said Reuben Thornton, said removal being made, executed, contrived and devised of fraud, covin, collusion and guile, to convey them from said State, out of and beyond the United States to Texas, to the end, purpose and intent to convert them to their own use and profit, and to delay, hinder and defraud the Georgia Rail Road and Banking Company, and others to whom said Slaves had been Mortgaged, AND OTHER CREDITORS IN THE STATE OF GEORGIA."

Now it is true, that this affidavit does not state when the said Bennett became possessed of the fact that there were "*other creditors in the State of Georgia*" besides this mort-

gage.—And it is not forgotten that said Bennett in his said answer says that he made this affidavit under misapprehension of its contents, yet in connetcion with the statement made in Exhibit "F." by Floyd and Bennett, to wit: "which said negroes are sold by the said Thornton to us the said R. J. Floyd and A. T. Bennett, subject to all the liabilities that are against them in the way of debt, either by note, *judgment* or mortgage in the State of Georgia, either as the property of Warren Jordan, or the said Reuben Thornton, the said Reuben Thornton only warranting the same against himself and his heirs," added to which a statement in said bill of complaint, that said Bennett at the time of said purchase knew of said judgment of said Carter in Georgia, and that said Bennett does not in his answer expressly deny that he knew or had heard of said judgment but speaks of "*valid claims,*" we can come to no other conclusion but that he knew or heard of said judgment at the time of said purchase.

We do no think it material whether he knew or had heard of said judgment or not, if our view of it is correct, they state under their and hand seal, that said negroes are sold by the said Thornton to them "*subject to all the liabilities that are against them, in the way of debt, either by note, judgment or mortgage in the State of Georgia.*"

It may all be true as Mr. Bennett says in his answer, that this instrument was designed as a private memorandum, for the protection of said Thornton's interest, and yet be a declaration or admission of the terms upon which the purchase was made.

A written instrument is construed by Courts, and in construing said written agreement, we think the first part

32

thereof is a declaration of the terms upon which said Floyd and Bennett purchased the said negroes, while in the latter clause thereof, they stipulate not to off-set or plead against the payment of the note therein mentioned, any thing that may be lost by suit in consequence of said claims or that they may have to pay.    Mr. Bennett in his answer gives a different version of this agreement, but the answer is only evidence of the facts, to which other testimony could be received, therefore the answer of defendant will not be admitted to show that the true intention of the parties to said written agreement was contrary to what appears on the face of it.    Bott vs. Berch, 4 Madd. 255.

It seems clear from the facts disclosed in *connexion* with this instrument, that they purchased only the Equity of Redemption of said Jordan and Thornton, in said negroes, and that as between the parties, the justice and Equity and understanding of the purchase (and Courts should equitably construe a lawful stipulation,) was that the mortgage of the Bank, and the judgment of Carter, were to be met and paid by said Bennett and Floyd, to any amount not exceeding the value of said slaves at the time said liability may be enforced, (if upon the final hearing of this case it should appear from the evidence that said mortgage and judgment were at the time of the purchase, due and owing in the State of Georgia, by either Jordan or said Thornton, and a *lien*, there upon said slaves.)

At any rate we can give it no other construction, unless we declare it an *illegal transaction*, void for fraud or champerty.    By thus viewing it, the purchase becomes a bona fide transaction, and the allegations of fraud charged against said Bennett in the bill, fall harmless and are un-

necessary to be considered. If said agreement was executed by said Bennett under false suggestions, assertions and fraudulent representations, and injury thereby inflicted, the Court of Chancery has in this suit on the final hearing, the power to relieve and do equity.

Considering said agreement of purchase a legal transaction, as between Bennett, Floyd and Carter' (provided he is found a mortgage or judgment creditor in Georgia,) it constitutes a constructive trust, a trust raised by Courts of Equity in their favor, as an interest in rem, capable of being enforced directly by Carter in a Court of Chancery only. 2 Story's Eq., Ju. page 673, § 1244. Ferris vs. Crawford, 2 Denis, 598, and Eugle vs. Haines, et al, 1 Halsteds Ch. R., 187.

It is contended by Mr. Davis, solicitor for defendants, that the trust is indefinite and cannot bn carried out.— We see no reason why the trust cannot be ascertained and carried out in a Court of Equity, particularly under the whole transactions between the parties as they are now before the Court.

Judge Semmes of Counsel says, "it was competent in Carter to ratify the trust and insist ¡upon its execution,' and he is estopped from insisting upon a trust which through a long course of judicial proceedings, he has heretofore disclaimed." It would have no doubt been much better had said Carter, long ago, filed his bill in Chancery, his neglect to do so, has caused much of the difficulty and perplexity in this cause; but we cannot find in the history of the litigation between these parties that Mr. Carter has either expressly or impliedly disclaimed the trust, he has been

a defendant, up to this suit, in all the litigation excepting the suit against Bennett in Georgia, and in this last suit, Bennett did not set up the trust ; there is nothing before us showing that the said trust was ever denied by said Bennett, until this bill was filed, therefore we cannot say said Carter is estopped from insisting upon said trust.

As to the 4th objection. It is no way clear that a Court of law could, under its mode of proceeding, give the relief asked for in the bill, as to the suits now pending in the Franklin Circuit Court, between the said parties, and it is doubtful whether a plea of *former recovery* could be pleaded to them, the rule is, that in doubtful cases of this character, Courts of Chancery will entertain jurisdiction. West vs. Wayne, 3 Missouri, 16, 1 Story's Commentaries, § 32.

As to the 5th objection. We do not think under the circumstances, the judgment rendered in said action of Trover between the said Bennett and Carter, should be considered as a final and conclusive adjudication, in respect to said mortgage and the ownership of said mortgage, because they were not and could not have been fully considered and determined. Had said mortgage and the ownership of said mortgage been fully before the Jury, and proven to have been duly assigned to said Carter, under the charge of the Court, no such verdict could have been rendered without having been set aside, as contrary to law and the charge as given by the Judge on the trial of said cause in 6th, 7th and 8th instructions asked. Neither the notes or the ownership of the mortgage were in evidence, and as to them, between Carter and Bennett, Carter was, as stated in the opinion of the Court in this cause, 4 Fla. R., page 348, a stranger.

Carter *vs.* Bennett, et al.—Opinion of Court.

The Jury considered the judgment in the foreclosure suit, (which was in evidence) erroneous and fradulent.— This Court has affirmed their finding and declared the judgment illegal, therefore the defence could not at that time and under the circumstances be made available in that suit.  It is true, as is urged by the counsel for the defendants, that on said trial an attempt was made to introduce the said notes, and thereby affirm the assignment of the mortgage to said Carter, and that the same was unsuccessful, and said Carter then relied upon said judgment of foreclosure for his defence, which was considered erroneous, consequently fraudulent, yet this is nothing more than an unsuccessful attempt to defend under the judgment of foreclosure and fraud.

As we have already seen, the mortgage and the ownership of said mortgage, could not have been considered and determined by the Jury, for they were not in evidence ; the notes [to secure which, it is alleged  the mortgage, was given, were ruled out  and withdrawn, and not again offered.

It is contended by the defendants, that the prayer of the bill asking foreclosure of said mortgage cannot be granted. The judgment of foreclosure on the petition, having been declared a nullity and void, we see no difficulty in the way of foreclosure of the seventy-nine negroes, brought  to this State and embraced in said mortgage as part of  the  relief asked in said bill.

It is admitted, as contended, that the proceedings to foreclose in *equity* is altogether a proceeding in rem, and the estate of the mortgagor cannot be reached further han the property  subjected in  the mortgage,  to  the

payment of the mortgage debt ; nevertheless, there is no difficulty under the peculiar circumstances of this case in carrying it out. The mortgagee, (Carter,) is the complainant ; he comes to the Court asking equity, of course he can be required to do equity. The Chancellor has full power to require him to submit the 17 negroes in his possession as mortgagee, to the foreclosure and sale, as also to require an account of the hires and increase. Besides it appears that some of the negroes are still in this State, and Bennett who has appeared and answered this bill of complaint, and who is the purchaser of the equity of redemption, can be required to brign forward the negroes which he has or should have, and in the event he does not, he and said Floyd as trustees, under their agreement aforesaid, may be decreed to pay the value of said negroes. This is not subjecting the purchaser of the equity of redemption to personal accountability, under an application to foreclose a mortgage ; but it is subjecting him or them to personal accountability in pursuance of their agreement of purchase ; nor is it subjecting the estate of the mortgagor *further* than the value of the property subjected to the payment of the mortgage debt.

As we have already said, Carter having submitted to the jurisdiction of this Court, and asks from it equity, in making him do equity, the judgment of Carter vs. Bennett, in Georgia, and which has been converted to a judgment in Florida, may be acted upon as the equities of the whole matters may seem best. So as to the judgment in Trover of Bennett vs. Carter. This also arises out of the mortgage transaction, and forms a part of the matters involved in litigation. In doing equity we see no reason why the judgment may not be permitted to stand restrained by the

injunction and be adopted by said Chancellor as an adjudicated amount for hires and damages for the *trespass* in having illegally taken into possession said 14 negroes, or if in his opinion, after hearing all the testimony, he should think the amount recovered grossly unconscionable, then he would have power to reduce the amount to such sum as might be considered right and proper.

If in any of the transactions in Georgia, or acts of Carter there, a credit in view of all the circumstances should be made by way of reduction or payment on said mortgage in this suit, the defendants Bennett and Floyd will have an opportunity of showing the same and claiming the credit.

It is insisted that the said Carter caused the equity of redemption in the real estate in Hall County, Georgia, to be levied upon there and sold under his said judgment at law, instead of under a decree of foreclosure to satisfy the mortgage debt, and purchased it in himself, thereby thereby uniting the legal and equitable title in him, and that *this is an extinguishment* of the mortgage debt.

Whatever might be said in this respect in a suit between Carter and the representatives of Jordan, (the mortgagro,) we do not think the position applicable to this case, under the circumstances attending it. The construction which we have given of the agreement of purchase of the equity of redemption in these 79 mortgaged nergoes, si, that Bennett and Floyd, (the purchasers,) agreed that this mortgage debt and others mentioned shonld be paid out of said negroes, or they would meet and pay the same to an amount not exceeding the value thereof, consequently any sale of said real estate on the judgment debt could work no injury to them, so far as this mortgage is concerned, but as to

the said judgment and the claims of Carter against them, under it, any acts of said Carter's in Georgia or elsewhere, such as fraud, collusion in sale, &c., operating an injury to said Bennett and Floyd, or either of them, are proper matters of security and adjudication by the Court on the final hearing under the proofs, and such credits may be decreed as are proved equitable and proper.

The 6th, 7th, 11th and 12th objections are considered and disposed of in what has been already said.

As to the 8th, 9th and 10th objections, we do not think under the *circumstances* as narrated in the record of said trial of Bennett vs. Carter, in Trover, the Court of Chancery is authorized under the principles of the Court or of sound discretion, to interfere *further*, than has been already stated in this behalf, should be done by reduction if considered just so to do under the peculiar equities of this whole litigation. Bills for a new trial according to Lord Redesdale, Bateman vs. Wiloe, 1 Schoales and Lefroy, 201, have not of late years been much countenanced in England. They are very rarely entertained in the Courts of Chancery in this country, and never excepting in a very clear case of fraud or injustice, or upon newly discovered evidence, which could not possibly have been produced at the first trial. See also Floyd vs. Jane, 6 John Ch., 480.

It is laid down in Story's Equity jurisprudence, vol. 2, §888, that "in general it has been considered that the ground for a bill to obtain a new trial after judgment in an action at law, must be such as would be the ground of a bill of review of a decree in a Court of Equity, upon the discovery of a new matter."

Again in § 887 the said commentator says: "*any facts*

*which prove it to be against conscience to execute,* such judgment and of which the injured party *could not have availed himself* in a Court of law, will authorize a Court of Equity to interfere by injunction."

Did this bill present *no other* matters of relief but a new trial, we should not grant it.

As to the 13th objection. It is stated with uncertainty and very vaguely in the bill, that this judgment of Roberts, Allen & Co., was at the trial and is now the property of said Bennett, and that the same was prosecuted for his benefit, and it was for slaves which had been recaptured by said Bennett. Although said Bennett is specially interrogated in the 18th interrogatory of the bill as to these facts, yet he does not seem to have answered said interrogatory in this particular.

Should it appear as charged, it would then be a part of this transaction or litigation, and the same course can be pursued in the Chancery Court as is pointed out in the other judgments.

As to the last objection. We have no "*fees or costs*" of Attorneys in this State taxable as between litigant or client and Attorney, other than is provided by the Statutes (see Thompson's digest 326.) and known as "Commissions for collecting."—That act provides "That it shall not be lawful for any Solicitor to charge more than five per cent on claims placed in his hand for collection, unless a specific contract *in writing* between the parties exists to the contrary; nor shall such charge be made except on amounts actually collected?

From this Statute it is ascertained what we are to consider in this State shall be "*fees*" of Attornies or Solicitors

33

in matters of collection, but for *other services* not of this denomination, and such as are claimed by the Solicitors in the case at bar, a *reasonable* and fair remuneration (quantum meruit) should be ascertained and allowed, and thus allowed will also constitute "fees or costs." And the same rules of law respecting their *liens* so well established in England, where those fees or costs are taxable, should prevail here.

While our Courts hold the members of the bar to strict accountability and fidelity to their clients, they should afford them protection and every facility in securing them their remuneration for their services. An Attorney has a right to be remunerated out of the results of his industry, and *his lien* on these fruits is founded in equity and justice.

The bill alleges in this case, that said Bennett is insolvent and has removed from the State. The Solicitors then are without hope of payment, unless it can be secured out of this judgment of Bennett vs. Carter, which is the result of the litigation for which they claim payment.

While we adopt as a rule, the doctrine of the Courts of Chancery in England, as laid down in Ex parte Rhodes, 15 ves. 541 by Lord Eldon, that the right of set-off prevails in general cases, so as to interfere with the Solicitors lien upon the debt recovered, yet as was said by Chancellor Walworth in Dunken vs. Vaudenbergh 1 Paige 626, "*where other claims arising out of different transactions and which could not have been a legal or equitable set-off in that suit, exists between the parties, the Court ought not to divest the lien of the Attorney or Solicitor which has already attached on the amount recover-*

*ed for the costs of that particular litigation.*"   When a party applies to the Equity of the Court to prevent the Solicitor from  exercising his legal  right to collect his  costs, *the equity of the Solicitor to have those  costs  should be taken into consideration."*

' The complainant applies in this case to the equity of the Court to prevent  the Solicitors  from  collecting their costs by enforcing the judgment against him.—The *trust* of Bennett and Floyd arrising  out of  a  different  transaction than that  for which said judgment was  recovered,  could not have been a legal  or equitable  set-off in that suit, for until foreclosure and sale of the mortgage negroes, the extent of  a  personal  liability  could  not  be  ascertained ; consequently this case comes exactly within the exception.

The greater difficulty  in this respect is, that the amount of Solicitors fees, respectively, are as yet undetermined.

The bill denies  that said  claims for fees exists, and insists  that if their liens  do exist,  the  amount  of  the  said several  claims ought to be reasonably adjusted and allowed  by the Court.   Mr.  Bennett  in his answer says,  the fees on said judgment in  Trover are  the sum  of $5,000 to Judge Semmes, and to Mr. Davis,  $3,700,  but he does not inform  us, whether this amount was fixed by agreement in writing, or when  it was agreed  upon, or  whether agreed upon  at  all, or  whether they are  a mere charge made by them without any agreement.

In the answer  of Judge Semmes,  which was  filed after said injunction was  dissolved, he states, that for  his services in said suit he is entitled to the sum of $5,000—that said sum was due and  owing him long  before the filing of this bill.

Mr. Davis in his answer, which was also filed after injunction dissolved says "that by contract with A. T. Bennett he was to receive" &c.; in another place he says, "that by agreement" &c. but he does not state when said contract was made, nor whether it was in writing, nor is any written contract or written agreement referred to as an Exhibit.

It therefore becomes necessary, that an inquiry and investigation should be had and the extent of the lien ascertained, which should be a *reasonable* and *adequate* compensation. This can be done at the final hearing of this matter and the Chancellor can then make such a decree in this respect, if he finds no difficulties in the way, as the proofs may warrant and as to him may seem right and just, and secure the payment out of the said recovery or recoveries as a *prior* equity.

The claim of defendant May as assignee of this Judgment of Bennett vs. Carter was briefly commented upon in the argument, and it is presented in the bill and answer of Bennett as well as of May. Bennett states *he still* has an *interest* in said judgment. It matters little whether he has or not; Mr. May took the assignment as a collateral security only, according to his own showing, and were he an out and out owner of it, under complete and full assignment, he would hold it subject to anterior equities.—2 Kelly 155.

It is obvious that in this view of the case, the Court cannot dissolve the injunction or dismiss the bill. The order dissolving the injunction was erroneous; the injunction must stand and the cause remanded to the Circuit Court for further action.

Carter *vs*. Bennett, et al.—Opinion of Court.

It will be seen that this Court as an Appellate Court, has adjudicated many of the leading questions, which should have been first decided, by the Judge in the Court below— a practice of very doubtful propriety.   As these questions were so fully and at length, urged by the Counsel of *both* parties, we consented to thus consider them ; it is not however, to be considered so as to operate as a precedent in other cases.